In the
United States Court of Appeals
For the Seventh Circuit

No. 01-1894

IRENE J. HOJNACKI, Doctor,

Plaintiff-Appellant,

v.
DONNA KLEIN-ACOSTA, DORETTA O'BRIEN,
ADDUS HEALTHCARE, INCORPORATED, et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 1356--Matthew F. Kennelly, Judge.

ARGUED JANUARY 14, 2002--DECIDED March 28, 2002

   Before POSNER, RIPPLE and DIANE P. WOOD,
Circuit Judges.

   RIPPLE, Circuit Judge.  Dr. Irene
Hojnacki, a discharged employee of Addus
Healthcare, Inc., ("Addus") brought this
action against Addus, its chief financial
officer and Illinois Department of
Corrections officials, alleging due proc
ess violations and claiming the right to
a name-clearing hearing. The district
court held that the due process claim
must fail because Dr. Hojnacki was not an
employee of the Illinois Department of
Corrections. For the reasons set forth in
the following opinion, we affirm the
judgment of the district court.

I

BACKGROUND

A.  Facts

   Dr. Hojnacki was employed by Addus
Healthcare, a private company under
contract with the Illinois Department of
Corrections ("DOC") to supply health care
services to inmates at DOC prisons. She
worked as medical director at the Dwight
Correctional Center for Women ("Dwight").
In March 1995, Doretta O'Brien, the
Administrator of Dwight's Healthcare Unit
("HCU"), filed an Incident Report with
the warden of the facility, Donna Klein-

Acosta. According to the report, Administrator O'Brien had reviewed an inmate's medical chart and discovered that she had been given a soft drink, 7-Up. Administrator O'Brien asked a nurse how the inmate came to have the soft drink, and the nurse responded that Dr. Hojnacki had given the soft drink to the inmate and had asked the nurse to give it to the inmate./1 The report states that Dr. Hojnacki had been informed that 7-Up could not be given to inmates and that their diets must come from the DOC. The report further indicates that Dr. Hojnacki stated, apparently upon being informed of this rule, that she would "bring [the soft drink] her self." R.1, Ex.B-1. The report also indicates that "[s]he was advised against it." Id.

After receiving the Incident Report, Warden Klein-Acosta sent a letter to Mark Heaney, the Chief Financial Officer of Addus, relating that Dr. Hojnacki had knowingly violated prison policies by delivering the 7-Up to a prisoner and recommending that "appropriate disciplinary action be taken that would disallow her entrance into the Dwight Correctional Center/KMSU." R.1, Ex.C. Addus then discharged Dr. Hojnacki because she was no longer allowed access to Dwight and because "no other similar positions exist[ed] with the Company." R.1, Ex.A.

When Dr. Hojnacki learned that she had been discharged, she requested a hearing from the warden, but the warden refused. Dr. Hojnacki also claims that the defendants made it known to employees of the prison and to medical professionals in Joliet, Illinois, that she brought contraband into the prison and gave it to a prisoner, a violation of Illinois law. Dr. Hojnacki denies the allegations against her and further asserts that they have become widely known in Dwight, Joliet and Chicago and that, as a result, she has not been able to find comparable employment.

B.  District Court Proceedings

Dr. Hojnacki filed a six-count complaint against Warden Klein-Acosta, Administrator O'Brien, Addus Healthcare and Mr. Heaney. She alleged that all of the defendants had violated her due process rights under the Fourteenth

Amendment by defaming her in connection with her discharge and thereby preventing her from finding comparable employment. She sought a name-clearing hearing. Dr. Hojnacki also asserted claims for sex discrimination under Title VII against all of the defendants and age discrimination under the Age Discrimination in Employment Act against Addus and Mr. Heaney. The remaining counts set forth various state-law causes of action.

The defendants filed motions to dismiss, asserting that, in order to prevail on her due process claim for a name-clearing hearing, Dr. Hojnacki had to demonstrate that she was a state employee, a showing that the defendants maintained she could not make. In response to the motions to dismiss, Dr. Hojnacki accepted the defendants' assertions that she would have to show that she was a DOC employee to prevail. She stated in her Answer: "We take as Bible Addus' and Heaney's assertion: In order to sustain a claim for Constitutional Tort - Liberty Interest - Name Clearing, plaintiff must demonstrate that 1) she was a public employee . . . ." R.10 at 2. The Answer explains further: "If [the defendants] are correct in their contention that the plaintiff was not a public employee, then this case should be dismissed." Id. at 7. Dr. Hojnacki maintained, however, that her employment status could only be determined after discovery. She observed that "[t]he discovery involved in establishing the issue of employment is but a small part of the overall discovery. It would indeed be unfortunate for all of the parties with great amounts of time and expenditures, as well as the time of the court, if it were pre-ordained that the plaintiff was not a public employee." Id. at 8. Dr. Hojnacki therefore suggested that "[a] limitation of discovery to only the issue of employment should promptly ascertain sufficient information to dispose of the issue." Id.

The district court denied the motions to dismiss but adopted the parties' view that only a state employee could state a claim against a state agency for defaming her in connection with her discharge and thereby preventing the employee from finding comparable employment. The court also adopted Dr. Hojnacki's proposal and

ordered that discovery initially be limited to the issue of whether Dr. Hojnacki was an employee of the DOC. After discovery, the defendants filed motions for summary judgment on that sole issue.

The district court held that Dr. Hojnacki was not a state employee and entered summary judgment for the defendants on the due process claim. The court also entered summary judgment for the individual defendants on the age and sex discrimination claims, a determination that Dr. Hojnacki does not appeal. Dr. Hojnacki moved for a voluntary non-suit on the age and sex discrimination claims that remained against Addus. The court granted the motion and dismissed those claims with prejudice./2 It also dismissed the remaining state-law claims. The only question on appeal is whether the district court properly granted summary judgment for the defendants because Dr. Hojnacki is not a state employee.

II

DISCUSSION

We review de novo the district court's grant of summary judgment. See Thomas v. Pearle Vision, Inc., 251 F.3d 1132, 1136 (7th Cir. 2001). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The relevant facts here are not in dispute; we therefore must determine only whether Dr. Hojnacki was an employee of the DOC as a matter of law and, if not, whether the defendants were entitled to summary judgment.

A.  The Cause of Action

Alleging a claim under 42 U.S.C. sec. 1983, Dr. Hojnacki maintained that the defendants had violated her due process rights by defaming her in connection with her discharge and thereby preventing her from finding comparable employment. A person does not have a protectable

liberty or property interest in her reputation, see Paul v. Davis, 424 U.S. 693, 701, 711-12 (1976), and mere defamation by the government does not deprive a person of "liberty" protected by the Fourteenth Amendment, even when it causes "serious impairment of [one's] future employment," Siegert v. Gilley, 500 U.S. 226, 234 (1991); see Paul, 424 U.S. at 697. Rather, it is the "alteration of legal status," that, "combined with the injury resulting from the defamation, justifie[s] the invocation of procedural safeguards." Paul, 424 U.S. at 708-09, 710. Thus, "[w]e have held many times that state employees have a liberty interest in not being discharged from their employment while being defamed such that they cannot get other government employment." Strasburger v. Bd. of Educ., 143 F.3d 351, 356 (7th Cir. 1998).

It may be that a resulting inability to find work in the defamed person's chosen profession is itself an "alteration of legal status" that would give rise to a due process claim on the part of a non-government employee whose employment was terminated because of the government's defamation. See Kartseva v. Dep't of State, 37 F.3d 1524, 1528 (D.C. Cir. 1995) (government contractor employee whose security clearance was inexplicably revoked by the Department of State and who could not find comparable work as a result could prevail on her claim for a name-clearing hearing if the DOS action formally or automatically excluded her from government employment opportunities or had "the broad effect of largely precluding [her] from pursuing her chosen career"); see also Greene v. McElroy, 360 U.S. 474, 492 (1959) ("[T]he right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment . . . ."); Colaizzi v. Walker, 812 F.2d 304, 307 (7th Cir. 1987) ("If a state or the federal government formally banned a person from a whole category of employment, it would be infringing liberty of occupation--a component of the liberty that the due process clauses of the Fifth and Fourteenth Amendment[s] protect, and recognized as such almost since the beginning of this nation."). Dr. Hojnacki, however, has not made such

an argument either before the district court or on appeal. Rather, she has maintained throughout the course of this litigation that she must show that she was a state employee to prevail./3 A party waives any argument that it does not raise before the district court or, if raised in the district court, it fails to develop on appeal. See United States v. 1948 S. Martin Luther King Dr., 270 F.3d 1102, 1117 n.17 (7th Cir. 2001). It is "not the work of this Court to formulate arguments for the parties." Kurzawa v. Jordan, 146 F.3d 435, 447-48 (7th Cir. 1998).

The liberty interest of which Dr. Hojnacki claims to have been deprived, then, is the liberty interest that state employees have "in not being discharged from their employment while being defamed such that they cannot get other government employment." Strasburger, 143 F.3d at 356. To prevail Dr. Hojnacki must show that she was a state employee.

B.   Employment Issue

Dr. Hojnacki maintains that she was either an employee or a loaned employee of the DOC. In determining whether a person is an employee, we apply a common-law test that involves "general principles of agency." Alexander v. Rush N. Shore Med. Ctr., 101 F.3d 487, 492 (7th Cir. 1997) (internal quotation omitted); see also Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323-24 (1992) (applying common-law test to determine whether a person is an employee as defined by the Employee Retirement and Income Security Act). The test requires us to consider five factors: (1) the extent of the employer's control and supervision over the worker, (2) the kind of occupation and nature of skill required, (3) which party has responsibility for the costs of operation, such as the provision of equipment and supplies and the maintenance of the workplace, (4) the source of payment and benefits and (5) the duration of the job. See Alexander, 101 F.3d at 492 (quoting Ost v. W. Suburban Travelers Limousine, Inc., 88 F.3d 435, 438 (7th Cir. 1996)). Of these factors, the extent of control and supervision over the worker is the most significant in determining the employment status. See id. at 493. In this case,

consideration of the last four factors does not indicate conclusively whether Dr. Hojnacki was an employee of the DOC. The second and fourth factors tend to show that she was not an employee of the state; the fifth factor tends to show that she was an employee; the third factor is inconclusive. The DOC's lack of control over the performance of Dr. Hojnacki's duties suggests, however, that Dr. Hojnacki was not a DOC employee.

Beginning with the second factor, Dr. Hojnacki did not derive her medical skills from her employment with the DOC. With regard to the costs of operation, the DOC supplied and maintained "the space, equipment, furniture, fixtures and other items required for the efficient operation of the health care unit . . . ." R.23, Ex.17, para. 4.12(a). Addus, however, supplied clothing for in-patient prisoners and "[a]ll medical supplies," which the contract with the DOC defined as medical equipment "with a unit cost of $100 or less." Id., para. 4.12(b), (e). The third factor, then, does not weigh heavily in favor of either possibility. A consideration of the fourth factor indicates that Dr. Hojnacki was not an employee of the DOC, because it was Addus, and not the DOC, that paid Dr. Hojnacki's wages and provided her with employment benefits. In fact, the contract between Addus and the DOC stated explicitly that Addus employees were not "entitled to participation in any retirement or pension plan, group insurance program, or other programs designed to benefit employees of the State of Illinois, Department of Corrections." R.23, Ex.17, para. 4.1.

The duration of Dr. Hojnacki's job, however, lends some support to a determination that she was a DOC employee. Dr. Hojnacki worked at the Dwight Correctional Facility for three years even while the DOC twice changed correctional healthcare providers. Dr. Hojnacki signed her initial employment contract in 1996 with Coastal Correctional Healthcare, Inc. In 1997, Coastal was replaced by Correctional Healthcare Solutions, and Dr. Hojnacki signed an employment contract with that provider. In 1998, the DOC contracted with Addus, with which Dr. Hojnacki signed an employment contract as well. Dr. Hojnacki's presence at Dwight as

medical director of the HCU for three years while the DOC cycled through three different healthcare providers suggests that she was an employee of the DOC.

Consideration of the most important factor, however, confirms that she was not an employee. The DOC did not control the performance of Dr. Hojnacki's duties. The contract between Addus and the DOC provided that Addus, not the DOC, "shall supervise all persons employed by it during the performance of their work within said institution, and they shall be employees of the Contractor and not employees of the Department of Corrections." R.21, Ex.B, at para. 2.0(E). Under the heading "Professional Ethics," the manual setting out the policies and procedures of the health care unit at Dwight provided that "[a]ll medical, psychiatric and dental matters involving clinical judgment are the sole province of the physician or dentist responsible for the care of inmates at Dwight Correctional Center . . . ." R.29, Ex.D, at 7. Dr. Hojnacki suggests that the manual's statement of professional ethics is mere surplusage because it simply reiterates the ethical standard that all doctors adopt with the Hippocratic Oath, and no doctor would allow a lay person to overrule her clinical judgment. Even so, the statement reflects a policy of deference in all "matters involving clinical judgment." As medical director, Dr. Hojnacki was to "plan, implement, direct and control all clinical aspects of the health care program." R.23, Ex.17, para. 4.8(o). The contract between Addus and the DOC also specified that "[i]n addition to administrative responsibilities, the on-site Medical Director shall also provide primary health care services on a routine basis." Id. Implementing "all clinical aspects of the health care program" and providing "primary health care services" would undoubtedly involve "clinical judgment" and would therefore be the "sole province" of Dr. Hojnacki.

Dr. Hojnacki submits, however, that the DOC controlled her work through the various policies and procedures with which the DOC required her to comply. For example, the DOC required Dr. Hojnacki to complete some training, though Dr. Hojnacki does not specify what kind; the DOC required Dr. Hojnacki, as medical

director, to serve on a Quality Improvement Committee, which was to sit monthly, perform audits and report to a governing body headed by the warden, all in an effort "to assure that high quality patient care is delivered in a cost efficient, safe and appropriate manner," R.29, Ex.D, at 18; the DOC required Dr. Hojnacki to perform a monthly review of mortality cases; the DOC specified what information should be included in admission and discharge forms; and the DOC specified how often to perform physical examinations of prisoners, what kind of questions to ask the inmates and to observe an inmate's behavior, appearance and mental status.

For an employer-employee relationship to exist, however, the employer must have "the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved . . . ." Alexander, 101 F.3d at 493. The procedural requirements that Dr. Hojnacki has put forward as examples of the DOC's control over her merely specify her duties as medical director; they do not control the manner in which she is to perform those duties.

We considered similar procedural requirements over a purported employee in EEOC v. North Knox School Corp., 154 F.3d 744, 748 (7th Cir. 1998). We determined that bus drivers were not school district employees even though the district set the precise route and schedule of each driver, limited the number of times and for what reasons a driver could be absent, and required drivers to enforce its disciplinary policies but did not allow them to administer punishment or set their own rules for appropriate behavior. See id. We observed that "one can 'control' the conduct of another contracting party by setting out in detail his obligations; this is nothing more than the freedom of contract. This sort of one-time 'control' is significantly different than the discretionary control an employer daily exercises over its employees' conduct." Id. Here, too, the DOC's contract with Addus requires Addus' employees to abide by the DOC's rules and regulations. The DOC's manual, which Dr. Hojnacki characterizes as the "most important evi dence" in her case, Appellant's Br. at

23, merely details Dr. Hojnacki's obligations. As in North Knox, the requirements are "significantly different than the discretionary control an employer daily exercises over its employees' conduct." Id.

Dr. Hojnacki also submits that the DOC controlled her by setting her working hours and requiring her to be on call. We rejected a similar argument in Ost v. West Suburban Travelers Limousine, Inc., 88 F.3d 435, 438 (7th Cir. 1996), in which we held that limousine drivers were not the employees of their dispatchers even though the dispatcher determined the drivers' starting times, because "the details concerning performance of the work remained essentially within the control of the driver." Id. at 438-39. For the same reason, we also rejected the argument that a hospital's requirement that a doctor remain on call rendered the doctor an employee of the hospital. See Alexander, 101 F.3d at 493. Dr. Hojnacki's arguments meet with no more success here because such constraints did not amount to control of the details of her performance.

After considering the relevant factors, especially the lack of control that the DOC exercised over the performance of Dr. Hojnacki's duties, we conclude that Dr. Hojnacki was not an employee of the DOC.

Nor did Addus loan Dr. Hojnacki to the DOC as an employee. "The loaned servant doctrine is a principle of agency law in which the first principal 'loans' his agent to a second principal, giving the second principal a heightened degree of control over the agent, along with the corresponding responsibility for the agent's acts and omissions." Williams v. Shell Oil Co., 18 F.3d 396, 400 (7th Cir. 1994). The control requirement applies to loaned employees as well. See Williams v. Grimes Aerospace Co., 988 F. Supp. 925, 936 (D.S.C. 1997) ("Under the common law, '[a] dual employment relationship may exist if more than one individual or company has the right to control or direct an employee in the performance of the work.'") (quoting 27 Am. Jur. 2d Employment Relationship sec. 5 (1996)). Therefore, because the DOC did not control Dr. Hojnacki in the performance of her duties, she was not the DOC's loaned employee.

Conclusion

Dr. Hojnacki has not argued that her inability to find work in her chosen profession itself entitles her to relief. Although she alleged in her complaint that she has been unable to find comparable work, she has argued throughout that the loss of her government job as a result of the DOC's defaming her in connection with her discharge gave rise to her due process claim for a name-clearing hearing. Because she was not a government employee, however, her claim, as she has chosen to frame and argue it, must fail. Accordingly, we must affirm the judgment of the district court. The district court therefore did not err in granting summary judgment for the defendants. The judgment of the district court is affirmed./4

AFFIRMED

FOOTNOTES

/1 The report indicates, somewhat equivocally, that Dr. Hojnacki both gave the soft drink to the inmate and asked the nurse to do so.

/2 The district court's order granting the motion for a voluntary non-suit did not indicate whether the claims were to be dismissed with or without prejudice. The district court subsequently granted Dr. Hojnacki's motion to clarify the record, however, and issued an order amending the previous order nunc pro tunc to provide for the dismissal of the claims with prejudice.

/3 Counsel for Dr. Hojnacki explicitly disclaimed any reliance on the theory that she could prevail as an employee of the private sector. At oral argument, the court engaged in the following colloquy with counsel for Dr. Hojnacki.

THE COURT: [Y]ou don't think the employment status is outcome determinative of your law suit?
COUNSEL: Oh, we must prove that she's an employee.

THE COURT: Of who?

COUNSEL: Of the state. . . .

THE COURT: Are you sure of that?

COUNSEL: That is our position.

* * *

THE COURT:  You're not relying on the theory that the state in effect has created such a blot on her character by barring her from the institution that she cannot be employed in her profession anywhere.

COUNSEL:  We have not relied on that. . . .

* * *

THE COURT:  Let me put it to you this way, . . . if we don't agree with you today and believe that summary judgment was correctly granted to your opponents on the issue of employment, is there anything left in this case?

COUNSEL: Ah, we are out of court.

Audio Tape of Oral Argument, No. 01-1894, Jan. 14, 2002.

/4 Dr. Hojnacki has moved to strike portions of the defendants' briefs. Our disposition of her claim renders those motions moot.